Joseph T. MORGAN, Jr., Plaintiff,

v.

Donald T. REGAN, Defendant.

Civ. A. No. 82–0954.

United States District Court, District of Columbia.

Sept. 19, 1984.

---

James H. Heller, Kator, Scott & Heller, Washington, D.C., for plaintiff.

Stuart H. Newberger, Asst. U.S. Atty., Washington, D.C., for defendant.

## DECISION AND ORDER

JACKSON, District Judge.

Plaintiff Morgan, a black printer employed by the Bureau of Engraving and Printing ("BEP") of the U.S. Treasury Department, sues the Secretary of the Treasury under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, for retroactive promotion and back pay, alleging that BEP engaged in race discrimination to his injury in the course of its selection of candidates to fill some 30 Plate Printer (Intermediate) ("PPI") positions beginning in July, 1978.[1] Upon the facts found as hereinafter set forth in accordance with Fed.R.Civ.P. 52(a) following trial without jury, and the conclusions of law drawn therefrom, for the reasons stated the Court will enter judgment for defendant.

### I.

BEP is the agency within the U.S. Department of the Treasury which prints all United States currency and most of its official stamps. Its Office of Currency Production and Stamp Printing is responsible for production of currency and stamps, within which the Superintendent, Plate Printing Division (the "Division"), directs its day-to-day operations.

All United States currency is printed by high-speed, sheet-feed rotary intaglio (i.e., incised plate) presses. Stamps are printed by high speed multi-colored sheet or web-fed intaglio or gravure presses. Both species of press are large, sophisticated pieces of equipment capable of printing thousands of sheets per hour. Mistakes can occur quickly, may be difficult to detect and costly to rectify, and give rise to concerns for the security of defective work which has value precisely because it is defective. Consequently, the skill, reliability and integrity demanded of the plate printers who operate the presses, as well as the remuneration they receive for doing so, are considerable.

The Plate Printing Division employs about 130 high-speed intaglio printers, well over half the number of all such printers in the United States. (The remainder are employed by three private banknote companies). The Division operates 20 high-speed plate presses, 17 of which are intaglio presses; two are gravure, and one is a combination intaglio-gravure press.

BEP has historically obtained its journeymen plate printers by recruiting directly

1. The appointments were made on and after November 27, 1978. Although not initially selected, Morgan was later given priority for a PPI vacancy and was appointed as such on October 31, 1983, where he remains today, apparently performing satisfactorily in the position.

from the private banknote houses and by training new plate printers through its own four-year apprenticeship program. Before and throughout the 1950's almost all plate printers were white. In the 1960's and early 1970's, however, BEP brought substantial numbers of blacks into its plate printing workforce, so that, as of 1978, over 30 percent of BEP's journeyman plate printers were black, while black representation in the plate printing craft outside BEP remained virtually nil.[2]

In the mid-1970's, BEP came to the realization that a significant proportion of its journeymen plate printers were approaching retirement age. Simultaneously the Federal Reserve Board, which orders and distributes the nation's currency, notified BEP that it intended to increase the amount of currency in circulation. Confronted with both a projected personnel shortage and an imminent need for increased production, BEP officials concluded that filling the large number of anticipated vacancies through the traditional four-year apprenticeship program would not enable BEP to keep up with demand, and it cast about for ways to augment its plate printing workforce quickly.

After consultations with the plate printers' union, therefore, BEP resolved to create a new position, to be known as the "plate printer (intermediate)" (or "PPI"), for which, in lieu of the four-year apprenticeship, applicants having relevant prior experience would be hired to become journeymen plate printers after an abbreviated training program.[3] Once the decision had been made to replace retirees with PPI's, BEP embarked on the process of finding the most promising among those who might apply by utilizing a recognized (but controversial) technique known as the "job element evaluation selection method" which attempts to identify and articulate the knowledge and skills necessary to perform successfully in the position to be filled.[4]

The personnel specialist at BEP assigned to direct the PPI recruitment effort convened a panel of nine current BEP journeymen plate printers as experts, of whom one was black.[5] The panel met on several occasions to formulate a list of "job elements."[6] After the subject matter experts

2. Beginning in the mid-1960's, BEP obtained permission from the Civil Service Commission to recruit in-house for the Plate Printing Division as a means of increasing black representation in the plate printing craft, and initiated a "Craft Opportunities Training Program," limited to current Bureau employees, which, like the apprenticeship program, entailed a four-year training period but differed from it in that trainees were, in theory, expected to await vacancies before becoming journeymen. In practice, however, the trainees became journeymen immediately upon completion of the program due to plentiful openings.

3. Although BEP already employed a substantial number of journeymen printers qualified in other processes, it decided against using its merit promotion program for fear that the "ripple effect" would deplete the ranks of its other divisions. The pressmen in BEP's other printing units, however, were still virtually all white in the late 1970's.

4. A panel of "subject matter experts" (normally experienced practitioners of a craft) is convened to define the elements of the job. Thereafter a "crediting plan" is developed which rates and ranks the elements, and a panel of "raters" is selected to apply the crediting plan to the appli-

cations received. Crediting plans are on occasion amplified during the rating process as applications are received to include significant experience not originally contemplated.

5. Six of the eight whites were present or past officers of Plate Printers Union Local No. 2, the local union for BEP's plate printers, who were appointed, in part, to placate the Union which had strongly opposed the PPI recruitment.

6. Having initially considered numerous potential "job elements," the panel finally settled upon four: "Knowledge of Equipment;" "Ability to Do the Work of the Position without More than Normal Supervision;" "Knowledge of Trade and Technical Practices and Ability to Interpret Instructions, Specifications, etc.;" and "Demonstrated Aptitude for Learning." Each was described in detail on separate sheets with four different levels of ability assigned point values on a scale of one to four, in ascending order, and denominated the "Rating Guide." A conversion table was used to convert the 16 points ($4 \times 4$) to a scale of 100, e.g., 8 = 70, 16 = 100. With the addition of 5 or 10 points for veterans' preference, the maximum possible score was 110. Two criteria were used to determine minimally qualified applicants: first, they

had concluded their work, the personnel specialist distilled it into a "crediting plan." In its final form the crediting plan assigned maximum importance to high speed, multi-color printing experience, and the consensus within BEP among those involved in the selection process, although unfortunately never explicitly declared, was that gravure pressmen would be the most promising applicants, because gravure, as a form of intaglio printing, makes use of an etched plate and a continuous plate wiping system not characteristically found on other printing equipment.

After preparing the crediting plan, the personnel specialist assembled a panel of "raters" to score the expected applications.[7] Although only one of the raters was himself a BEP plate printer, all had either professional experience or academic training as pressmen, all were approved by the Civil Service Commission prior to being named to the panel, and all were thereafter given some training in rating procedures at the Civil Service Commission.

While the crediting plan was being formulated, BEP began the process of advertising the PPI vacancies. Copies of the vacancy announcements were posted throughout BEP, distributed nationwide by the Civil Service Commission, and sent to all government agencies in Washington, D.C., including the Government Printing Office. BEP also undertook to advertise the vacancies in 28 newspapers nationwide, eight of which were chosen because they were primarily addressed to black readerships.

The application season for the 1978 PPI competition ran from July 14 to October 6, 1978. BEP estimates that it received approximately 850 applications for the PPI positions of which some 350 to 400 applicants possessed basic qualifications.[8]

At about the time the recruitment began, a major gravure printing plant in Philadelphia owned by Triangle Publications ("Triangle") ceased operations, laying off about 250 journeyman printers. The president of the printers' union local at Triangle saw BEP's ad for the PPI program in a Philadelphia newspaper and called the members' attention to it. As a result about 150 former Triangle printers applied, only one or two of whom were black.

Approximately 12 BEP employees from outside the Plate Printing Division also applied, including plaintiff Morgan (then working as a janitor), a former black co-plaintiff (a bookbinder), and approximately 10 pressmen from two other divisions, all but one of whom were white. Thus, three of 12 in-house BEP applicants were black.

Each application was rated by three different raters.[9] Each rather assigned a score of from one to four on each of the four elements graded, but whenever a discrepancy of two or more points would occur between the ratings given by different raters on the same element to a particular applicant, the application was returned to the raters to attempt to resolve the disparity.

Plaintiff Morgan was found basically qualified. The raters accorded him a raw

must have achieved at least two points on Job Element I, "Knowledge of Equipment;" second, they must also have received an overall converted score of 70 (8 on the Rating Guide).

7. The rating panel consisted of seven BEP employees, all of them white. The only rating panel member who was a plate printer himself was a vice president of Plate Printers Union Local No. 2 and had been on the subject matter panel as well. The rating panel was appointed by the Chief of BEP's Office of Currency and Stamp Printing.

8. Because it did not retain the applications of applicants who were not selected (except those

of Morgan and a former co-plaintiff), BEP has no precise information on the number of applications received or the number of applicants found basically qualified for the PPI positions. BEP was, of course, forbidden by law to ask the race or national origin of applicants. The parties stipulate that at least 10 black printers, including Morgan, applied, and eight of the 10, including Morgan, were found basically qualified.

9. Although the personnel specialist took precautions to conceal the names on the applications, raters could have deduced the identity (and, possibly, the race) of most applicants had they desired.

rating of 78 out of a possible 100, to which was added a five-point veterans' preference bonus, giving him a total score of 83 out of a possible 110.[10]

Morgan's application lists a variety of full or part-time positions previously held as an *offset* pressman prior to applying for the PPI position in 1978. The majority of plaintiff's offset experience, as reflected by his application, was acquired during a ten-year stint as an assistant pressman at the Department of the Interior from 1960 to 1970.[11] His only journeyman experience occurred during a three-month period in 1972 on a small single-color offset machine, and an additional eight-month span from mid-1974 to the beginning of 1975 when he divided his time between single and multi-color offset presses. For the three years immediately preceding his application while working as a janitor at BEP, Morgan had moonlighted at a private firm as a duplicating machine operator.

After all applications had been rated (excluding those screened out initially by the personnel specialist), the applications, along with the ratings, were submitted to the Civil Service Commission where they were reviewed for accuracy. The Commission then approved the ratings, issued a certificate of "eligibles" of some 80–90 names, ranked strictly in order of rating scores, and returned the certificate to BEP for the actual selections.

The selecting official was the then Superintendent of the Plate Printing Division. He arranged interviews with the people whose names appeared on the certificate, beginning with the person with the highest score and continuing down in rank order until all the available positions had been filled.[12] Altogether, he estimated, he interviewed about twice the number of vacancies to be filled. The initial selection of PPI's began on November 27, 1978, and continued until September 10, 1979, with 30 PPI's having been selected, and the same list was used again to select eight more PPI's in early 1980. Twelve of the first 30 PPI's selected were former Triangle printers. Another five were pressmen from elsewhere in BEP. Yet another five were offset printers employed at the time by two private Washington, D.C., area printers. All told, 22 of the first 30 PPI's selected came from only four prior employers, including BEP itself, and all 30 initial successful PPI applicants were white (although one was of Hispanic origin).[13]

## II.

The facts found above establish a *prima facie* case of discrimination under Title VII. Plaintiff Morgan belongs to a racial minority. He applied for and was found qualified for the job he was seeking, but his application was rejected and non-minority applicants were hired. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The resulting presumption of discrimination must, therefore, be rebutted by defendant BEP, which it has endeavored to do by showing a legitimate, non-discriminatory reason for not selecting Morgan among its

**10.** At least two other black applicants received ratings of 94 and were on the certification list sent to the selecting official. He interviewed, however, from the top of the list down, and the names of both were near the end of a number of candidates on the list who had identical 94 scores. The cutoff score being 94, neither was ever interviewed.

**11.** Morgan claimed without contradiction to have been solely responsible for printing a multi-color geologic atlas of the near side of the moon for the U.S. Geological Survey while at the Department of the Interior, which appears, to an untrained observer, at least, to be a most sophisticated piece of work. The atlas, however, did not accompany his application for a PPI position and was apparently never brought to the attention of BEP at all during the selection process.

**12.** The Superintendent's interviews were intended to verify the applicant's work experience claimed on his application, to ascertain whether he would be able to work harmoniously with other plate printers, and to inquire into his personal history to uncover information which might prevent his passing the security investigation required of plate printers.

**13.** The next eight applicants selected in early 1980 were also white.

first PPI's. Since a plaintiff always retains the ultimate burden of proof in Title VII cases, however, Morgan may only overcome BEP's evidence of a proper reason to have passed him over in favor of his unprotected competitors by further proof that BEP's reason was mere pretext to conceal a clandestine prejudice against blacks as plate printers. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).[14]

BEP's ostensible reason for not taking Morgan on as a PPI in 1978–79 is, quite simply, that at least as many others as there were positions available appeared to be better qualified than Morgan and the other black applicants on the basis of the best information it was able to assemble— which did *not* include the race of any applicant—and that the law does not require it to select minority applicants over others if their qualifications are no more than equivalent. *Burdine, supra*, at 259, 101 S.Ct. at 1096. The issue is, therefore, whether Morgan's evidence is sufficient to compel the conclusion that BEP did, indeed, notwithstanding its protestations to the contrary, intend to treat black applicants differently than whites, or that it used a selection process which was so designed or administered that it would inevitably cause qualified blacks to be relegated to the bottom of the eligibles list.

Morgan suspects a racial animus in the treatment given his PPI application—and those of other black applicants—but, not surprisingly, cannot prove it directly. The circumstantial evidence he offers from which, he argues, its presence should be inferred, however, is too ambivalent,

ephemeral, or both, to sustain his burden of proof. He relies, for example, on mathematical laws of chance. Working backwards from official U.S. occupational statistics which suggest that between 1970 and 1980, five to eight percent of pressmen, plate printers, or "printing machine operators" in the country were black, and from estimates of BEP's own EEO officer that 30 percent of the in-house applicants were black, he submits that the fact that all of the first 30 PPI's selected were white males tends to prove that blacks, both within and without BEP, were deliberately passed over. But if the circumstance tends to prove what Morgan says it does, it also ignores the ethnic, sexual, or physical attributes of all the other unsuccessful applicants who might with equal force contend that they were rejected because they were whatever they were. The laws of mathematical chance are probative only in the context of random selection; BEP's selection process was deliberately constructed to be rational rather than random.

Morgan also tenders anecdotal evidence: a mildly racist joke exchanged by members of the rating panel; a rumored cronyism among selecting officials and plate printing foremen who were virtually all white males; nepotism (one successful applicant was the father of a senior BEP official); a belated and unspoken predilection for gravure experience; instances of allegedly exaggerated credentials being overlooked on successful applications.

None of Morgan's evidence, taken separately or in the aggregate, is, in the Court's opinion, sufficient to refute the unequivocal assertion of each BEP official involved that race was of no consequence to him in his

---

**14.** On February 7, 1984, the Court denied plaintiff's motion for partial summary judgment on the issue of liability, based upon an intra-agency decision, in September, 1983, on Morgan's November, 1979, EEO complaint. In effect the agency found that the delay in processing his complaint had been so egregious that it would accord him relief "as if" discrimination had been established, for which the appropriate remedy in the circumstances was priority consideration for the next vacancy. That priority resulted in his appointment as a PPI on October

31, 1983. The intra-agency decision not having been a disposition on the merits finding plaintiff to have been, in fact, a victim of discrimination, however, defendant is not subject to the rule of *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir. 1976) requiring it to prove by "clear and convincing evidence" that Morgan would not have been hired despite discrimination. *Day v. Mathews* applies only when the employer concedes (or the court finds) discrimination but the causal connection remains in issue.

part in the selection process. Their testimony was forthright, plausible, unimpeached, uncontradicted, and essentially unimpaired by cross-examination.

There is, moreover, circumstantial evidence which bolsters defendant's case. The BEP personnel who conceived and implemented the PPI plan were acting on behalf of a government whose public policy (not to mention the law of the land) has been one of non-discrimination for some time. To infer that they engaged in discrimination would be to find that they knowingly acted contrary not only to the law but also to the will of their employer. Then, too, the tenure of those in authority encompassed the years of affirmative action at BEP when minority representation in the plate printing workforce was purposely enhanced, and it is unlikely that they would undertake to undo social change for which they had been in part responsible. Finally, the extraordinary degree to which responsibility was dispersed among the participants, even had racism been rampant in the mind of any one of them, militates against any finding that prejudice actually affected the results of the selection process. The possibility that the personnel specialist, a crediting expert, a rater, a Civil Service Commission trainer or certifier, or the selecting official, acting alone, could have effectively blocked the selection of blacks by exercising his prejudices at any stage of the process is improbable, and there is no evidence whatsoever of a conspiracy.

Racial discrimination is not only illegal; it is opprobrious. If it is surreptitious and, therefore difficult to prove directly, it is equally difficult to disprove, and as with any antisocial conduct, the stigma may linger long after an accusation never substantiated. Plaintiff's suspicions, however sincerely entertained, are no substitute for evidence that reputable civil servants are lying when they deny having committed or condoned such conduct.

Plaintiff also contends that the selection system itself was so designed and administered as to have had a disparate impact on black applicants. The evidence he offers to support such a conclusion, however, is, once again, the fact that no blacks were selected, although the applicant population included some, and a generalized critique of the selection process having to do mostly with the imprecision of the rating criteria, the disproportionate emphasis placed on gravure experience, and the absence of more extensive training for the rating panel.

The statistics are no more probative of a biased selection system than of biased selectors, and the criticisms of the system itself are merely that. They suggest, at most, that the system was flawed, but they do not prove that it was either designed to or had the effect of automatically placing any particular group of applicants at a competitive disadvantage.

The Court finds that the selection system, while perhaps susceptible of improvement, was fairly designed to identify and articulate the skills and abilities of people most likely to become adept as plate printers in the shortest possible time, and then to locate those people in the applicant pool and hire those who gave the best account of themselves in terms of intangible qualities such as character, maturity, ambition, and responsibility. It was, moreover, contrary to plaintiff's suggestion of covert racism, undertaken with an express "affirmative action" impetus which induced BEP to advertise the positions' availability in the minority press, and against the backdrop of BEP's historical record of having built a plate printer workforce with the highest minority representation in the nation.

The Court concludes, therefore, that plaintiff has failed to prove that BEP intentionally discriminated against blacks in its recruitment of plate printers (intermediate) in 1978–79, or that its method of selecting from among qualified applicants was so designed and implemented as to have had that unintended, although equally impermissible, result.

It is so ORDERED, that judgment be entered for defendant.